# Ronald Lee Hoke, Sr.

### v.

# Commonwealth of Virginia

Record No. 880268

March 3, 1989

Present: All the Justices

304

*John H. Maclin, IV,* for appellant.
*(R. Scott Pug for appellant,* on ineffective assistance of counsel claim).
*Thomas C. Daniel, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

STEPHENSON, J., delivered the opinion of the Court.

Ronald Lee Hoke, Sr., was indicted for the capital murder of Virginia C. Stell in the commission of robbery, abduction, and rape. Code § 18.2-31. A jury found Hoke guilty of capital murder as charged in the indictment.

Pursuant to the bifurcated-trial procedure prescribed by Code § 19.2-264.4, a separate hearing on the penalty was conducted. In the penalty phase of the trial, the Commonwealth presented evidence of aggravating factors, and Hoke offered evidence in mitigation. The jury fixed Hoke's punishment at death. Thereafter, the trial court conducted a sentencing hearing pursuant to Code § 19.2-264.5, and at the conclusion of the hearing the court imposed the death sentence.

We have consolidated the automatic review of Hoke's death sentence with his appeal from his capital murder conviction, Code §§ 17-110.1(A) and -110.1(F). Pursuant to Code § 17-110.2, we have given them priority on our docket.

I

PRETRIAL MATTERS

A

*Constitutionality of the Death Penalty Statute*

Hoke contends that Code §§ 19.2-264.2 and -264.4(C) are unconstitutional because they "are overly broad and impermissibly vague." Hoke correctly acknowledges, however, that we have "rejected this claim in other cases." *See, e.g., Gray* v. *Commonwealth,* 233 Va. 313, 320-21, 356 S.E.2d 157, 161 (compiling cases), *cert. denied,* 484 U.S. ____, 108 S.Ct. 207 (1987). Adhering to our previous rulings, we again reject this contention.

■ Hoke also contends that death by electrocution constitutes cruel and unusual punishment in violation of the Federal and Virginia Constitutions. We have repeatedly rejected this argument, *see, e.g., Gray*, 233 Va. at 320, 356 S.E.2d at 160-61 (compiling cases), and adhere to our previous holdings.

## B

### *Change of Venue*

■ Hoke contends that the trial court abused its discretion in failing to grant a change of venue. This issue is not properly before us. Hoke made no proffer of evidence to support his assertion that certain newspaper articles and reports by the broadcast media prevented his receiving a fair trial in the City of Petersburg. Moreover, Hoke has waived the contention. When he first moved for a change of venue, he requested that the motion be continued until it could be determined whether a jury could be impanelled. His counsel agreed that he could renew the motion if jury *voir dire* indicated that "it's a problem." The motion was not renewed, and, therefore, we will not consider this contention on appeal. Rule 5:25.

## II

## THE GUILT PHASE

### A

### *Facts*

On either October 4 or 5, 1985, in mid-afternoon, Hoke and Stell, the victim, were in the European Restaurant in the City of Petersburg. Initially, they were in different areas of the restaurant. Later, however, Hoke came across the room and joined Stell at her table. About 6:00 p.m., Hoke and Stell left the restaurant together.

On October 7, the police found Stell's body in the bedroom of her apartment. Stell had sustained two lethal stab wounds, one in the right upper front quadrant of her body and the other in her right back. The front wound was six-and-one-half inches deep; the depth of the wound to the back was two-and-five-eighths inches. Fresh, red bruises were on Stell's arms. A medical examiner testified that the stab wounds caused Stell's death. She opined that

Stell "had some period of time of survival, at least several minutes."

Stell's "anal ring" was dilated and smeared with "stool" and a greasy, yellow substance "like margarine, butter." A blue electrical cord was wrapped around Stell's wrists, binding them so tightly that "there wasn't any way for her to get out of it." Her ankles were bound with a brown electrical extension cord, rendering the ankles immobile. Her mouth had been "gagged" with a pair of "panties," tied so tight that they left "an impression."

A knife was found on an ironing board in Stell's bedroom. The knife was covered with blood that matched Stell's blood type. Beside the knife was a clothes iron. The blue electrical cord around Stell's wrists had been cut from the iron. Several dresser drawers were open, and their contents had been "dumped" on the bedroom floor. Items from two purses — including empty pill containers — were strewn upon the floors of the bedroom and an adjacent dining room-kitchen.

Swabs and smears were taken and examined in a laboratory for the presence of semen (spermatozoa). Semen was identified "on the vaginal swabs and smear, on the anal smear," and on a "towel labeled 'peri-anal wipings.'" Semen found on sheets and a bedspread in the bedroom was consistent with Hoke's blood type.

On October 15, 1985, about 3:25 a.m., Hoke "flagged . . . down" a police officer in Hagerstown, Maryland. He told the officer that he had murdered a woman in Petersburg, Virginia. The officer immediately advised Hoke of his *Miranda* rights and took him to police headquarters.

At the police station, Hoke related that he had met a woman named Virginia at the European Restaurant, and he and the woman had gone to her apartment. He stated that he murdered the woman by stabbing her twice, "once in the back, once in the abdomen area in the front." He said that after he stabbed the woman "she was screaming," so he "placed a pillow . . . over her face to muffle her screaming." Hoke said he knew the woman was dead before he left the apartment "because she wasn't breathing, she wasn't moving, and her eyes were rolled back in her head." Finally, Hoke said that he dumped the woman's purse, "took some pills and left" the apartment.

Petersburg police officers also interrogated Hoke on October 15. At the time, Hoke was in the Hagerstown jail. After "being advised of his rights and waiving his rights," Hoke told the officers

that he had murdered Stell in her Petersburg apartment. Hoke said he had met Stell at the European Restaurant and thereafter had accompanied her to her apartment. Upon their arrival at the apartment, they "had sex." He then "put [a knife] to her throat," tied her hands together, bound her feet, and gagged her mouth. He stabbed Stell in the back with the knife, muffling her screams with a pillow. He then rolled her over and stabbed her in the stomach. As Stell continued to scream, Hoke held the pillow over her face for four or five minutes until she died. He then "ransacked" the apartment and stole some of Stell's medication that was in her purse.

On October 17, while confined in the Petersburg jail, Hoke contacted the police and repeated his confession to them. He also stated at that time that he had decided to kill Stell while they were walking to her apartment, adding that he had thought about killing someone for a long time, and "this seemed like a perfect opportunity" to do it.

Hoke told a fellow inmate in the Petersburg jail that he had come to Petersburg to see Stell. Hoke said that he had "sold drugs to the woman or somebody in that apartment complex." Hoke said he killed Stell when he "found out that she had ripped him off" and that "he couldn't get his stuff back."

In his trial testimony, Hoke stated that he and Stell "had sex" and then "made love the second time anally," using margarine as a lubricant. Then "[w]e got into an argument. I can't remember exactly what it was about, but she started cussing me." Next, "[s]he slapped me in the face . . . and I stabbed her in the back." Hoke said he "kind of freaked out." He "grabbed some cords and started tying her up and she started to scream so [he] went ahead and . . . tried to muffle the screams" with a pillow. Stell continued to scream so Hoke "grabbed the knife again and stuck it in her stomach." He then found a bottle of pills in Stell's pocketbook and left the apartment with the bottle.

## B

### Juror Claiborne Manns

■ Hoke contends that the Commonwealth, in exercising its fourth peremptory jury strike, intended to strike venireman Claiborne Manns, but the clerk "arbitrarily" struck Elizabeth G. Moran, whose name immediately followed Manns'. We cannot con-

sider this contention on appeal, however, because no objection was made at trial. Rule 5:25.

## C

### Reputation Evidence of Victim's Unchaste Character

Hoke contends that the trial court erred in refusing to admit evidence of Stell's unchaste character. We do not agree.

■ In enacting Code § 18.2-67.7,[1] the "rape shield" statute, "the General Assembly intended to preclude evidence of general reputation or opinion of the unchaste character of the complaining witness in all circumstances." *Winfield* v. *Commonwealth*, 225 Va. 211, 220, 301 S.E.2d 15, 20 (1983). Hoke's counsel, as an apparent proffer, told the trial court:

> I think at best I could, through various witnesses, would prove that it was [Stell's] reputation that she would go out with them and quite possibly go back to the apartment but as to any specific sexual act that occurred, I have no such evidence, other than what was the popular belief of the people at the European.

To this statement, the trial court correctly replied that "general reputation and opinion . . . is positively barred by [Code § 18.2-67.7]." Therefore, we affirm the trial court's ruling.

## D

### Sufficiency of the Evidence

■ To convict Hoke of capital murder, the Commonwealth not only had the burden of proving beyond a reasonable doubt that the killing was willful, deliberate, and premeditated, but that it was "in the commission of, or subsequent to, rape," Code § 18.2-31(e), or "in the commission of robbery while armed with a deadly weapon," Code § 18.2-31(d), or "in the commission of abduction . . . when such abduction was committed with the intent to extort money or a pecuniary benefit," Code § 18.2-31(a). Hoke

---

[1] Section 18.2-67.7 provides in part:
A. In prosecutions under this article, general reputation or opinion evidence of the complaining witness's unchaste character or prior sexual conduct shall not be admitted.

contends that the evidence is insufficient as a matter of law to support the jury's findings that he committed any of the underlying felonies, and therefore, he cannot be convicted of capital murder.

■ Rape is defined as sexual intercourse against the victim's will by force, threat, or intimidation. Code § 18.2-61. *See also Sutton* v. *Commonwealth*, 228 Va. 654, 662-63, 324 S.E.2d 665, 669-70 (1985). Ordinarily, whether the act of intercourse was forcible or consensual is a question for a jury to decide. *Snyder* v. *Commonwealth*, 220 Va. 792, 796, 263 S.E.2d 55, 58 (1980). Rape, like any other crime, may be proved by circumstantial evidence. *Orange* v. *Commonwealth*, 191 Va. 423, 435, 61 S.E.2d 267, 272 (1950).

The medical examiner found red, fresh bruises on Stell's body, two inside the left wrist, one on the right forearm, and one on the upper right arm. Stell's wrists and ankles had been tightly bound with electrical cords. Her mouth was snugly gagged. And yet, Stell was 56 years old and weighed only 125 pounds.

■ On appeal, we view the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth. In so doing, we conclude that the evidence is sufficient to support the jury's finding that the act of intercourse was against Stell's will and resulted from force, threat, or intimidation.

Robbery is "the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation." *Pritchard* v. *Commonwealth*, 225 Va. 559, 561, 303 S.E.2d 911, 912 (1983) (quoting *Mason* v. *Commonwealth*, 200 Va. 253, 254, 105 S.E.2d 149, 150 (1958)). Hoke contends that the evidence fails to establish a "causal connection between the murder and the robbery."

Hoke stated that he came to Petersburg to see Stell, that after seeing her he learned that she "had ripped him off," and that he killed her when he found out that he "couldn't get his stuff back." Thus, the jury reasonably could have concluded that Hoke "ransacked" the apartment searching for the "stuff," discovered the pills, and stole them.

■ Moreover, the jury also reasonably could have found that "the killing and the theft were interdependent objects of a common criminal design," and if so, the evidence would support a conviction of capital murder. *Wise* v. *Commonwealth*, 230 Va. 322, 334, 337 S.E.2d 715, 723 (1985) (quoting *Edmonds* v. *Common-*

*wealth*, 229 Va. 303, 310, 329 S.E.2d 807, 813, *cert. denied*, 474 U.S. 975 (1985)), *cert. denied*, 475 U.S. 1112 (1986). *See also Linwood Earl Briley* v. *Commonwealth*, 221 Va. 532, 544, 273 S.E.2d 48, 56 (1980), *cert. denied*, 451 U.S. 1031 (1981) (killing following robbery "part of the same criminal enterprise"). Indeed, the trial court properly instructed the jury that "[m]urder during the commission of a robbery occurs where the killing is so closely related to the robbery in time, place, and causal connection as to make it a part of the same criminal enterprise." Thus, we hold that the evidence supports the jury's finding that Hoke killed Stell in the commission of robbery while armed with a deadly weapon.

Finally, Hoke contends that the trial court erred in refusing to strike the evidence as it relates to capital murder in the commission of abduction because the same restraint was necessary for that offense as for capital murder in the commission of robbery and capital murder in the commission of rape. We do not agree.

In *Brown* v. *Commonwealth*, 230 Va. 310, 314, 337 S.E.2d 711, 713 (1985), we said that "in the enactment of the abduction statute the General Assembly did not intend to make the kind of restraint which is an intrinsic element of crimes such as rape, robbery, and assault a criminal act, punishable as a separate offense." When such other crimes involving restraint of the victim are committed, an accused cannot be subject to a separate penalty for a conviction of abduction unless "the detention committed . . . is separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime[s]." *Id.* at 314, 337 S.E.2d at 714.

In the present case, Stell's wrists and ankles were bound securely with ligatures, her mouth was gagged tightly, and she was detained for a lengthy period. Applying the *Brown* rule to these facts, we conclude that Stell's detention was greater than "the kind of restraint that is inherent in the act of rape," *id.*, or in the commission of robbery. Thus, we hold that the evidence supports the jury's finding that Hoke killed Stell in the commission of abduction.

In sum, the jury found Hoke guilty of capital murder in the commission of rape, capital murder in the commission of robbery, and capital murder in the commission of abduction.[2] The

---

[2] Following the pronouncement of its verdict, the jury was polled, and each juror affirmed the verdict of capital murder as to all three underlying felonies.

evidence supports all three convictions. We note, however, that a finding of guilty on any one of the underlying felonies would have supported a capital murder conviction.

## III

## THE PENALTY PHASE

### A

*Facts*

In the penalty phase, the Commonwealth presented evidence of Hoke's past criminal record, which consisted of the following:

| Year | Conviction | State |
| --- | --- | --- |
| 1975 | simple assault | Maryland |
| 1979 | trespassing, loitering, and prowling | Florida |
| 1980 | attempted arson | California |
| 1981 | carrying a concealed weapon | California |
| 1981 | vandalism | California |
| 1982 | resisting arrest and vandalism | California |
| 1983 | burglary | Maryland |

On October 17, 1985, Hoke made the following statement to a police detective:

> For the last 12 years, I've been on my own, just running, traveling, just doing what I wanted to do, getting high all the time. I've stole trucks, broke in things, ripped off dope dealers, a little bit of everything. Assaults, jumped people, beat them with things just to collect money together for a dope deal or something. Hell of a life.

Hoke's mitigation evidence consisted of the testimony of five witnesses, including that of Hoke. Other than Hoke, the witnesses were Barbara Moore, a clinical social worker; Barbara Marget, a social worker who succeeded Moore as Hoke's counselor; Gary Wiley, a jail chaplain; and Alfred Rimmer, another jail chaplain.

Shortly after Hoke's arrest, Moore began counseling Hoke and worked with him approximately eight months. She was counseling

Hoke "for his depression, his anxiety and his manipulative and suicidal behavior." Initially, her counseling "involved using a lot of confrontation because [Hoke] was manipulative." Eventually, however, Hoke responded to her treatment. As a result, "there were fewer incidences of suicidal threats and gestures, and [Hoke] began to verbalize his anxiety."

Marget, as Moore's successor, had been counseling Hoke for the two months prior to his trial. She testified that Hoke "came from two alcoholic parents," and he has "been on the street since age 13." He has had "a variety of hospitalizations and incarcerations." Marget felt that "oftentimes [Hoke] tried to reach out for help and looked for assistance within the system," but until she and Moore counseled him, nothing "really [came] through for him."

Wiley, the jail chaplain, visited with Hoke on a daily basis for about nine months. Wiley dealt with Hoke "not only [on] a spiritual level but [on] a social and educational level" as well. Hoke attended church, Bible classes, and other religious programs at the jail. Wiley believed Hoke was remorseful.

Rimmer is the current jail chaplain. He testified that Hoke was participating in a correspondence course.

Hoke testified that his father "drank a lot." When his father was drinking, he "used to take it out" on Hoke and Hoke's siblings.

Hoke began using drugs when he was about 12 years old. He started with marijuana and progressed to heroin and cocaine. He became involved in trafficking narcotics. He travelled around the country, settling at times in Florida and California. In June 1985, Hoke returned to Hagerstown, Maryland. In September 1985, he was in Richmond, then "up in D.C." He was "just partying" and "[j]ust drifting around."

Hoke has been in nine or ten mental hospitals. Once he was admitted for attempted suicide — at other times for drug abuse. Toward the end of September, he was confined in Richmond Memorial Hospital for "a loss of memory from drug abuse." From there, he was committed to Central State Hospital for treatment. After four or five days, he was released from Central State. On the same day that he was released, he was readmitted to Central State for "a drug overdose."

Hoke said he turned himself in for Stell's murder because he was tired of the life he had, "the running, the drugs, just going

through my whole life like . . . a high-speed train." He stated that the counseling he received in jail had helped him deal with the problems he has "had with suicide and drug abuse." He testified that he felt "very sorry" for what happened.

## B

### *Jury Instruction Number 5*

Code § 19.2-264.4(D) provides as follows:

The verdict of the jury shall be in writing, and in one of the following forms:

(1) "We, the jury, on the issue joined, having found the defendant guilty of (here set out the statutory language of the offense charged) and that (after consideration of his prior history that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society) or his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved (torture) (depravity of mind) (aggravated battery to the victim), and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death.

Signed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . foreman"
or

(2) "We, the jury, on the issue joined, having found the defendant guilty of (here set out statutory language of the offense charged) and having considered all of the evidence in aggravation and mitigation of such offense, fix his punishment at imprisonment for life.

Signed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . foreman"

The trial court, without objection, granted Instruction Number 5 which set forth the verdict form specified by Code § 19.2-264.4(D).[3] By its verdict, the jury adopted the language contained in part (1) of the statutory forms and fixed Hoke's punishment at death.

---

[3] The trial court also granted Instruction Number 1 which correctly instructed the jury as follows:

Hoke contends on appeal that Instruction Number 5 "was ambiguous and vague and therefore violated [his] constitutional rights to a unanimous verdict." He argues that the instruction "does not delineate" between the future dangerousness and the vileness predicates, although Hoke concedes that "the death sentence was certainly unanimous."

We rejected a similar contention in *Coleman* v. *Commonwealth*, 226 Va. 31, 307 S.E.2d 864 (1983), *cert. denied*, 465 U.S. 1109 (1984). In *Coleman*, as in the present case, "the trial court, without objection, gave the jury an instruction stating the verdict form specified in Code § 19.2-264.4D." *Id.* at 53, 307 S.E.2d at 876. The jury returned a verdict "in the exact language of the verdict form, fixing Coleman's punishment at death." *Id.* We concluded that "[i]t [was] readily apparent that the jury based its sentencing verdict on both statutory alternatives." *Id. Accord Clark* v. *Commonwealth*, 220 Va. 201, 213, 257 S.E.2d 784, 791-92 (1979), *cert. denied*, 444 U.S. 1049 (1980) (trial court did not err "in following the language of [Code § 19.2-264.4(D)] in instructing the jury").

In the present case, the jury's verdict, employing the statutory language, found both the "future dangerousness" and the "vileness" predicates in fixing the death sentence. The trial court "polled" the jury, and each juror affirmed that this was his or her verdict. Clearly, therefore, the jury based the sentence of death

You have convicted the defendant of an offense which may be punished by death. You must decide whether the defendant shall be sentenced to death or to life imprisonment. Before the penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt at least one of the following two alternatives:

(1) That, after consideration of his past criminal record, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society; or,

(2) That his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder.

If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt either of the two alternatives, then you may fix the punishment of the defendant at death or if you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment of the defendant at life imprisonment.

If the Commonwealth has failed to prove either alternative beyond a reasonable doubt, then you shall fix the punishment of the defendant at life imprisonment.

upon both predicates, *i.e.*, findings that "there is a probability that [Hoke] would commit criminal acts of violence that would constitute a continuing serious threat to society" and Hoke's "conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman."

## C

### *Sufficiency of the Evidence to Establish "Vileness"*

A jury may recommend imposition of the death penalty if it finds from the evidence beyond a reasonable doubt that the accused's "conduct in committing the offense . . . was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim." Code § 19.2-264.2 (the "vileness" predicate). In the present case, the jury made such a finding. Hoke, however, contends that the evidence does not support the jury's finding.

We will not repeat the facts in great detail. We only need allude to them. Stell was raped and sodomized. She was bound at her wrists and ankles so snugly that she could not have freed herself. A gag was placed tightly over her mouth. Hoke plunged a knife into her back, and muffled Stell's screams with a pillow. He then stabbed Stell in her stomach a depth of six-and-one-half inches. As Stell continued to scream, Hoke held the pillow over her face for four to five minutes until Stell died.

Hoke's conduct falls squarely within this Court's construction of the vileness predicate. Hoke subjected Stell to torture prior to and following the infliction of her fatal wounds. The battery to her body qualitatively and quantitatively exceeded the minimum necessary to accomplish an act of murder. *See Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979). Clearly, it constituted an "aggravated" battery. Moreover, Hoke's conduct reveals a depraved mind. Indeed, Hoke said that he had thought about killing someone for a long time. Thus, we hold that the evidence supports the jury's finding of vileness.

## D

### *Sufficiency of the Evidence to Establish "Future Dangerousness"*

Hoke contends that the evidence is insufficient to support the jury's finding that "there is a probability that [Hoke] would commit criminal acts of violence that would constitute a continuing serious threat to society" — the "future dangerousness" predicate for the imposition of the death penalty. The jury based its finding on a "consideration of [Hoke's] past criminal record of convictions," Code § 19.2-264.2, his "prior history," Code § 19.2-264.4(C), and "the circumstances surrounding the commission of the offense of which [Hoke] is accused," *id.*

As previously stated, Hoke had prior convictions of, *inter alia*, assault, attempted arson, carrying a concealed weapon, resisting arrest, and burglary. In addition, Hoke's "prior history," objectively and by his own admission, suggests a life of increasingly violent crime. He stated, *inter alia*, that he had done "a little bit of everything. Assaults, jumped people, beat them with things just to collect money together for a dope deal or something." Admittedly, Hoke "was at one time" addicted to drugs, including heroin.

Moreover, the brutality of the crime itself cannot, and should not, be ignored in assessing Hoke's future dangerousness. We previously have discussed this in some detail. Suffice it to say, Hoke's conduct during the commission of the present offense suggests a probability that he would commit criminal acts of violence in the future.

We hold, therefore, that the evidence is sufficient to support the "future dangerousness" predicate.

## IV

## SENTENCE REVIEW

Code § 17-110.1 provides that "[i]n addition to consideration of any errors in the trial enumerated by appeal," we must make an independent review of the death sentence on the record. The statute requires us to consider and determine: "1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and 2. Whether the sentence . . . is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

 Hoke does not claim that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Nonetheless, pursuant to the statute's mandate, we have reviewed the record to determine whether any such factors are present. We find nothing from the review to suggest that Hoke's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Hoke contends that the death sentence is excessive or disproportionate to the penalty imposed in similar cases. He principally argues that the evidence is insufficient to support the findings of the "future dangerousness" and "vileness" predicates for the imposition of the sentence. We previously have rejected this argument.

 In our independent review of the record to determine whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases," our inquiry is whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980). Pursuant to Code § 17-110.1(E), we have accumulated the records of all capital murder cases appealed to this Court.

Having considered these records, we determine that Hoke's sentence is neither excessive nor disproportionate. *See, e.g., Stout* v. *Commonwealth*, 237 Va. 126, 376 S.E.2d 288 (1989) (capital murder in the commission of robbery, both future dangerousness and vileness found); *Gray*, 233 Va. 313, 356 S.E.2d 157 (capital murder in the commission of robbery, both future dangerousness and vileness found); *Pruett* v. *Commonwealth*, 232 Va. 266, 351 S.E.2d 1 (1986), *cert. denied*, 482 U.S. 931, 107 S.Ct. 3220 (1987) (capital murder in the commission of rape and robbery, both future dangerousness and vileness found); *Edmonds*, 229 Va. 303, 329 S.E.2d 807 (capital murder in the commission of robbery, both future dangerousness and vileness found); *Watkins* v. *Commonwealth*, 229 Va. 469, 331 S.E.2d 422 (1985), *cert. denied*, 475 U.S. 1099 (1986) (capital murder in the commission of robbery, both future dangerousness and vileness found); *Clozza* v. *Commonwealth*, 228 Va. 124, 321 S.E.2d 273 (1984), *cert. denied*, 469 U.S. 1230 (1985) (capital murder in the commission of rape, both future dangerousness and vileness found); *Coleman*, 226 Va. 31, 307 S.E.2d 864 (capital murder in the commission of rape, both future dangerousness and vileness found); *Quintana* v. *Commonwealth*, 224 Va. 127, 295 S.E.2d 643 (1982), *cert. de-*

*nied*, 460 U.S. 1029 (1983) (capital murder in the commission of robbery, both future dangerousness and vileness found); *Clanton v. Commonwealth*, 223 Va. 41, 286 S.E.2d 172 (1982) (capital murder in the commission of robbery, both future dangerousness and vileness found); *James Dyral Briley v. Commonwealth*, 221 Va. 563, 273 S.E.2d 57 (1980) (capital murder in the commission of rape and robbery, both future dangerousness and vileness found); *Linwood Earl Briley*, 221 Va. 532, 273 S.E.2d 48 (capital murder in the commission of robbery, both future dangerousness and vileness found); *Mason v. Commonwealth*, 219 Va. 1091, 254 S.E.2d 116, *cert. denied*, 444 U.S. 919 (1979) (capital murder in the commission of rape, both future dangerousness and vileness found); *Smith*, 219 Va. 455, 248 S.E.2d 135 (capital murder in the commission of rape, both future dangerousness and vileness found).

## V

## CONCLUSION

We have considered all of Hoke's assignments of error[4] and find no reversible error. We also have made the statutory review of the death sentence as prescribed by Code § 17-110.1 and determine that the sentence should be affirmed. Accordingly, the trial court's judgment will be ·

*Affirmed.*

---

[4] On Hoke's motion, we appointed separate, independent counsel to represent him "with respect to any claim of ineffectiveness of counsel in the trial of this case." In our order of appointment we directed counsel to determine whether " 'all matters relating to such issue [of ineffectiveness] are fully contained within the record of the trial,' Code § 19.2-317.1," and, if so, to pursue the claim in this appeal, and, if not, to so report to this Court.

Independent counsel reported that after reviewing the trial record as it relates to Hoke's claims of ineffectiveness of counsel, he concluded that "the record below is incomplete and insufficient to permit this Court to determine the ineffectiveness of trial counsel." Accordingly, because all matters relating to the issue of ineffectiveness of trial counsel are not "fully contained within the record of the trial," we cannot consider the issue in this appeal. Code § 19.2-317.1.